J-S07042-22

2022 PA Super 86

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SHAWN A. HOBEL | : | |
| | : | |
| Appellant | : | No. 822 WDA 2021 |

Appeal from the Judgment of Sentence Entered October 22, 2019
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s):  CP-37-CR-0000202-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SHAWN AARON HOBEL | : | |
| | : | |
| Appellant | : | No. 823 WDA 2021 |

Appeal from the Judgment of Sentence Entered October 22, 2019
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s):  CP-37-CR-0000196-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SHAWN AARON HOBEL | : | |
| | : | |
| Appellant | : | No. 824 WDA 2021 |

Appeal from the Judgment of Sentence Entered October 22, 2019
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s):  CP-37-CR-0000195-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |

                    v.                          :
                                                :
                                                :
                                                :
     SHAWN AARON HOBEL                          :
                                                :
               Appellant                        :      No. 825 WDA 2021

     Appeal from the Judgment of Sentence Entered October 22, 2019
   In the Court of Common Pleas of Lawrence County Criminal Division at
               No(s):  CP-37-CR-0001008-2017


BEFORE:  OLSON, J., SULLIVAN, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                        **FILED: MAY 10, 2022**

        In these consolidated appeals, Shawn Aaron Hobel (Hobel) appeals from

the judgment of sentence of 20 to 40 years imposed by the Court of Common

Pleas of Lawrence County (trial court) after a jury convicted him of robbing

three convenience stores and various offenses related to a high-speed chase

with the police.  On appeal, he raises four challenges.  First, he challenges the

denial of his suppression motion in which he alleged that the extraterritorial

actions of the police in the chase violated the Municipal Police Jurisdiction Act

(MPJA), 42 Pa.C.S. §§ 8951-8954.  Second, he challenges the joinder of his

cases for trial.  Third, he challenges the sufficiency of the evidence for the

robberies because none of the clerks identified him at trial.  Finally, he

challenges the weight of the evidence for his convictions.  We affirm.

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

**I.**

Over a 40-hour period in December 2016, a man wearing a gray hoodie and a black mask robbed three convenience stores in Lawrence County with what looked like a black handgun. None of the clerks could identify the robber but the clerk in the last robbery saw the robber get into a dark-colored sedan. As a result, New Castle Police put out a "be on the lookout" (BOLO) to area police departments for the sedan. A few hours later, Officer Michael Lynch (Officer Lynch) of the Shenango Township Police was patrolling when he saw a sedan matching the BOLO. While following the sedan into neighboring Slippery Rock Township, Officer Lynch saw another car parked in the woods; at the time, Hobel was in the car doing drugs with his friend, Elissa Heemer (Heemer). When he saw Officer Lynch turn around, Hobel fled. After going through a stop sign, Hobel sped away swerving across the road. Officer Lynch activated his emergency lights but Hobel would not pull over as he led police on a high-speed chase spanning multiple municipalities and police departments. The chase eventually ended when Corporal James Hoyland (Corporal Hoyland) of the New Castle Police blocked off Hobel's car. With no escape possible, Hobel held a gun to Heemer's head and threatened to kill her. When Hobel disregarded several warnings, Corporal Hoyland shot him six times, following which he was taken to a hospital and survived.

At the scene, Heemer told police that Hobel admitted to her in the car that he had committed several robberies. The police then obtained a search

warrant for Hobel's car and found several items connecting him to the robberies: a gray hoodie; a black airsoft gun; black masks; and a pack of cigarettes of the same brand asked for by the robber during one of the robberies. In the meantime, police also recovered Hobel's shoes because they resembled those worn by the robber.

Police filed four complaints against Hobel—three for the robberies and one for the chase. Before trial, Hobel moved to suppress the items recovered, arguing both Officer Lynch and Corporal Hoyland acted extraterritorially in violation of the MPJA. After two hearings, the trial court denied suppression and, upon the Commonwealth's motion, joined the four cases for trial.

Hobel was tried by a jury. In the robbery cases, the jury found him guilty of robbery, theft and receiving stolen property.[1] In the other case, the jury found him guilty of terroristic threats, unlawful restraint, reckless endangerment (four counts) and fleeing or attempting to elude police.[2] Because Hobel had a prior robbery conviction, the Commonwealth sought the mandatory minimum 10-year sentence for the robbery convictions. *See* 42 Pa.C.S. § 9714(a)(1). The trial court imposed consecutive sentences of 10 to

---

[1] 18 Pa.C.S. §§ 3701(a)(1)(ii), 3921(a) and 3925(a). The cases were docketed at Lawrence County Docket Numbers 195-2017 (824 WDA 2021), 202-2017 (822 WDA 2021) and 1008-2017 (825 WDA 2021).

[2] 18 Pa.C.S. §§ 2706(a)(1), 2902(a)(1), 2705 and 75 Pa.C.S. § 3733(a). The case was docketed at Lawrence County Docket Number 196-2017 (823 WDA 2021).

20 years for two of the robberies and concurrent sentences on all remaining charges. Hobel filed post-sentence motions raising, among other claims, sufficiency and weight of the evidence claims. When those motions were denied, he filed a timely appeal that was later dismissed for failure to file a brief. After Hobel's direct appeal rights were reinstated on collateral review, he filed these direct appeals, which we consolidated *sua sponte*.

## II. Suppression

### A. Factual Background

Hobel first argues that the trial court erred in denying his suppression motion based on the alleged MPJA violations.[3] The trial court gave a detailed summary of the evidence at the suppression hearing.

_____

[3] Our standard of review for a challenge to the denial of a suppression motion

> is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

The chase occurred on the night of December 12, 2016, progressing into the morning. (Omnibus Pretrial Hearing, November 28, 2017, p. 5). Shenango Township Police Officer [Lynch] had received information on a series of robberies in the area of Shenango. *Id*. at 5-6. The 911 Call Center put out a brief description of a vehicle which was possibly involved, describing a brown or dark-in-color four-door sedan. *Id*. at 6-7. The 911 Call Center dispatch was by the Shenango Township Police Department as well as the New Castle Police Department. *Id*. at 7. Based on this information, Officer Lynch began looking for the vehicle. *Id*. At one point during this search, Officer Lynch was near the border of Shenango Township and Slippery Rock Township sitting in the parking lot of a church on the corner of Route 388 and Center Church Road. *Id*. at 32. Center Church Road runs East-West. It crosses Route 388, running North-South, which constitutes the dividing line between Shenango Township in the West and Slippery Rock Township on the eastern side of 388. *Id*. at 30-31. This area constituted part of Officer Lynch's routine patrol area. *Id*. at 44-45. As Officer Lynch was sitting in the church parking lot, he observed a black sedan travelling in Shenango Township heading East on Center Church Road toward Slippery Rock Township. *Id*. at 32. Officer Lynch left his position at the church parking lot, crossed over 388 and began to follow the black sedan. *Id*. at 33.

While Officer Lynch was following the black sedan, he noticed another sedan pulled off the road inside a wooded area on Center Church Road. *Id*. at 8. The wooded area appeared to Officer Lynch to be an abandoned utility pull-off which was once used but now was overgrown. *Id*. at 10. Officer Lynch noted this was not a location where he would expect a vehicle to be typically sitting. *Id*. Officer Lynch passed the second vehicle's location by about 100 yards and turned around in the next driveway. *Id*. It was Officer Lynch's intent at this point to inspect this second vehicle. *Id*. at 35. The second vehicle turned on its lights and headed toward Route 388 as soon as Officer Lynch turned around.

---

*Commonwealth v. Martin*, 253 A.3d 1225, 1227–28 (Pa. Super. 2021) (citation omitted). Our scope of review of a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *See Commonwealth v. Bumbarger*, 231 A.3d 10, 15 (Pa. Super. 2020), *appeal denied*, 239 A.3d 20 (Pa. 2020).

*Id*. Officer Lynch followed the vehicle returning to Route 388, at which point the vehicle accelerated away from Officer Lynch. *Id*. at 9. The vehicle proceeded through the stop sign at the intersection of Route 388 and Center Church Road. *Id*. The vehicle did not stop and turned north onto Route 388. *Id*. Officer Lynch activated his emergency lights and sirens at this point. *Id*. at 9, 35-36. Route 388 constituted a rough border of Shenango and Slippery Rock Townships, with some parts of 388 entirely in Shenango, some parts entirely in Slippery Rock, and in some parts 388 runs exactly along the border of the two.

Officer Lynch was able to call into the 911 Call Center and call in the registration of the pursued vehicle. *Id*. The dispatch center radioed back and identified the owner of the vehicle as [Hobel]. *Id*. at 10-11. Another Shenango Township Police Officer communicated to Officer Lynch that [Hobel] was a possible suspect of robberies being investigated. *Id*. at 10. Officer Lynch pursued the vehicle to New Butler Road/422, at which point the vehicle made a right turn through a red light and headed toward Interstate 79. *Id*. at 11. Officer Lynch radioed his dispatch to notify the Pennsylvania State Police the chase was passing into Slippery Rock Township, which they covered. *Id*. at 12.

Speeds during the chase on 422 ranged from 20 miles per hour to 120 miles per hour. *Id*. at 12-13. Weather conditions were slightly wet and slippery, it having rained prior to the chase but not during. *Id*. at 15. The chase continued on 422 eventually leaving Slippery Rock Township until [Hobel] turned onto Interstate 79 South. *Id*. at 13. It was at this time the Pennsylvania State Police were able to join in the chase. *Id*. On 1-79 South, [Hobel] would swerve as if he was going to take an exit and then swerve back to continue on 1-79. *Id*. [Hobel] exited 1-79 at the Evans City/Zelienople exit in Butler County. *Id*. at 13-14. He proceeded onto Route 19 toward Zelienople, at which point Officer Lynch saw there was no traffic in their path. *Id*. at 14. The chase continued towards Portersville. *Id*.

Officer Lynch continued to call out the position of the chase, and although other departments were checking in, the pursuing vehicles were solely Officer Lynch and the State Police. *Id*. at 15. The departments which checked in were New Wilmington, Union Township, Hickory Township, and New Castle. *Id*. The chase proceeded on Route 19 through Portersville until [Hobel] turned left onto Route 488. *Id*. at 16. [Hobel] turned onto another road,

which Officer Lynch was not able to identify. *Id*. The chase was headed back toward Center Church Road at this point, where it began. *Id*. The chase passed through the intersection of 388 and Center Church Road, but this time [Hobel] headed toward Route 65, continuing on Center Church Road. *Id*. at 17. When [Hobel] reached Route 65 he took a right turn and headed toward New Castle. *Id*.

The chase approached New Castle. Officer Lynch saw a marked New Castle Police Department cruiser (later learning this cruiser to be Officer Hoyland's)[4] facing the opposite direction on Route 65. *Id*. The cruiser had its emergency lights and siren on. *Id*. at 17-18. [Hobel] braked hard, put the vehicle in reverse, and made a left turn onto the Route 422 bypass headed towards Union Township. *Id*. at 18. [Hobel] slowed to 20-25 miles per hour on this segment and continued to brake hard at random intervals. *Id*. It appeared to Officer Lynch [that Hobel] was attempting to cause Officer Lynch to hit the [Hobel's] vehicle. *Id*.

The Court now turns to Corporal Hoyland's perspective.

Corporal Hoyland began his shift on December 12, 2016, at 8:00 P.M. *Id*. at 49. At the beginning of the events, Corporal Hoyland was stationary in his vehicle at the New Castle Police Station. *Id*. at 50. Corporal Hoyland began to listen to the radio traffic of the county police departments, and he noted they were in the middle of a chase. *Id*. Corporal Hoyland drove towards the city line with Shenango Township, noting the chase appeared to be heading back towards New Castle, and further noting the neighboring jurisdictions tended to help each other. *Id*. at 50, 59. Corporal Hoyland informed his supervisor he was heading to the city line in case the chase proceeded into New Castle's jurisdiction. *Id*. Initially, Corporal Hoyland was waiting in Cascade Park on the border of Shenango Township and New Castle. *Id*. at 58, 62. After determining this was not a good vantage point from which to monitor the traffic approaching the city along this route, Corporal Hoyland moved to a parking lot in Shenango Township between two gas stations. *Id*. at 64. Corporal Hoyland waited at this location for around 30 minutes. *Id*. at 62.

---

[4] In its pretrial opinion, the trial court referred to Corporal Hoyland as Officer Hoyland. We have substituted his correct title.

Corporal Hoyland was able to see Officer Lynch's lights approaching his position at which point he pulled into the roadway on Route 65 so they could see him. *Id*. at 51. Corporal Hoyland could see the chase stopped and turned onto the 422 Bypass. *Id*. Corporal Hoyland then joined the pursuit of [Hobel]. *Id*. at 51-52. Corporal Hoyland remained in radio contact with his supervisor during this period, relaying information regarding the chase. *Id*. at 54.

The chase at this point consists of [Hobel] and his passenger (later identified as [Heemer]), Officer Lynch, and the NCPD vehicle operated by Corporal Hoyland. *Id*. at 18-19. [Hobel] continued to drive on the 422 Bypass past the Moravia Street exit headed toward Interstate 376 and Union Township. *Id*. at 19. [Hobel] passed the merger lane to head on I-376 South, but when he got to the merge point where I-376 traffic was entering the 422 Bypass, [Hobel] braked hard, and made a U-Turn to head the wrong direction up the ramp, against the flow of traffic. *Id*. Corporal Hoyland pulled his NCPD cruiser ahead of [Hobel's] vehicle around the right side; at the same time Officer Lynch pulled in behind and together they were able to box in [Hobel]. *Id*. at 19-20.

Corporal Hoyland and Officer Lynch exited their vehicles and they approached [Hobel's] vehicle. *Id*. at 20. Corporal Hoyland exited the driver's side of his vehicle, which was closest to [Hobel's] vehicle. *Id*. at 54. As soon as Corporal Hoyland got to the front of [Hobel's] vehicle he saw [Hobel] holding what appeared to be a handgun to the head of [Heemer]. *Id*. Ultimately, the 'handgun' turned out to be a replica Airsoft pistol, which was nearly indistinguishable from a real firearm. [Hobel] was saying or yelling something at the time, but Corporal Hoyland could not hear [Hobel]. *Id*. at 55. Officer Hoyland drew his weapon in response to the actions of [Hobel] and commanded [Hobel] to drop his gun. *Id*. When he did not, Corporal Hoyland shot [Hobel]. *Id*.

[Hobel] dropped the gun and Corporal Hoyland holstered his pistol. *Id*. at 56. Corporal Hoyland approached the passenger side of the vehicle and Officer Lynch approached the driver side. *Id*. at 21. Officer Lynch removed [Hobel] from the vehicle and Corporal Hoyland sequestered [Heemer]. *Id*. at 21, 56.

Pretrial Opinion and Order (PTO), 7/11/18, at 3-8.

### B. MPJA

The MPJA defines the primary territorial jurisdiction of municipal police officers as "[t]he geographical area within the territorial limits of a municipality or any lawful combination of municipalities which employs a municipal police officer." 42 Pa.C.S.A. § 8951. "The MPJA is intended to promote public safety while maintaining police accountability to local authority; it is not intended to erect impenetrable jurisdictional walls benefiting only criminals hidden in their shadows." *Commonwealth v. Lehman*, 870 A.2d 818, 820 (Pa. 2005) (emphasis, brackets, internal quotation marks and citations omitted). To that end, "Section 8953 [of the MPJA] authorizes arrests, execution of search warrants and other official police conduct outside of an officer's primary jurisdiction in six specific circumstances." *Commonwealth v. O'Shea*, 567 A.2d 1023, 1029 (Pa. 1989). Those six specific circumstances are as follows:

(1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to the requirements of the Pennsylvania Rules of Criminal Procedure, except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which regularly provides primary police services in the municipality wherein the warrant is to be served.

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which

offense the officer continues in fresh pursuit of the person after the commission of the offense.

(3) Where the officer:

(i) has been requested to aid or assist a Federal, State or local law enforcement officer or park police officer;

(ii) has probable cause to believe that a Federal, State or local law enforcement officer or park police officer is in need of aid or assistance; or

(iii) has been requested to participate in a Federal, State or local task force and participation has been approved by the police department of the municipality which employs the officer.

(4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

(5) Where the officer is on official business and views an offense, or has probable cause to believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property.

(6) Where the officer views an offense which is a felony, or has probable cause to believe that an offense which is a felony has been committed, and makes a reasonable effort to identify himself as a police officer.

42 Pa.C.S. § 8953(a)(1)-(6).

Yet when a police officer's extraterritorial actions do not fall within one of these exceptions, suppression is not automatically appropriate. *See O'Shea*, *supra* at 1029. As this Court has explained:

- 11 -

Two conflicting positions have arisen in this Court on the question as to whether a violation of the MPJA entitles an aggrieved party to suppression under the exclusionary rule. In ***Commonwealth v. Bradley***, 724 A.2d 351 (Pa. Super. 1999) (*en banc*), this Court noted the exclusionary rule applies to any evidence gathered subsequent to an MPJA violation even if the officer acts in good faith or the police officer's actions would have been lawful if performed within the proper jurisdictional limits.

In ***Commonwealth v. Chernosky***, 874 A.2d 123 (Pa. Super. 2005) (*en banc*), ***appeal denied***[,] ... 902 A.2d 1238 ([Pa. ]2006), this Court implicitly rejected the absolutist approach espoused in ***Bradley*** in favor of the case-by-case approach approved of by our Supreme Court in [***O'Shea***]. The factors to be considered in applying this case-by-case approach consist of all the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the [MPJA], and the prejudice to the accused. [***See***] ***Chernosky***, ***supra*** at 130. The ***Chernosky*** Court further noted that the spirit, or purpose of, the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist.

***Chernosky*** unquestionably sets forth the proper standard this Court is to employ in determining whether the exclusionary rule should act to suppress evidence obtained pursuant to an MPJA violation. ***Chernosky*** relies on an approach approved by our Supreme Court, is more recent than the decision rendered in ***Bradley***, and sets forth a standard which allows this Commonwealth's courts to tailor a remedy in situations where police intentionally have overstepped their boundaries while still affording our courts the flexibility to deny suppression when police have acted to uphold the rule of law in good faith but are in technical violation of the MPJA.

***Commonwealth v. Henry***, 943 A.2d 967, 971-72 (Pa. Super. 2008)

(quotation marks and most citations omitted).[5]

---

[5] In ***Commonwealth v. Hlubin***, 208 A.3d 1032 (Pa. 2019) (plurality), our Supreme Court addressed the continued validity of the ***O'Shea*** test. Three

- 12 -

## C. Officer Lynch

Hobel first argues that none of the MPJA exceptions apply to Officer Lynch's investigative foray into Slippery Rock Township, which is covered by the state police. At suppression, the trial court agreed with Hobel that none of the exceptions applied to Officer Lynch's actions, focusing its discussion on the lack of applicability of the "hot pursuit" exception under § 8953(a)(2). **See** PTO 11-12. Even so, the trial court ultimately found that suppression was an inappropriate remedy under these circumstances, citing **Henry** and **O'Shea**. **See** PTO at 12-15. The trial court, however, revisited the issue in it Rule 1925(a) opinion and concluded that Officer Lynch's actions fell under the "official business" exception set forth at 42 Pa.C.S. § 8953(a)(5). Citing our Supreme Court's decision in **Commonwealth v. Pratti**, 608 A.2d 488 (Pa. 1992), the trial court gave this analysis:

> …Officer Lynch was on official business in his jurisdiction when he was parked at the church as it was part of his routine patrol and while he was searching for a vehicle matching the description in

---

justices were unwilling to condone its continued application for avoiding suppression of MPJA violations. **Id**. at 1049-51 (Opinion of the Court) (Donohue, J., joined by Todd and Wecht, JJ). In contrast, three justices would have declined addressing the continued validity of the test because it was not raised. **Id**. at 1052-53 (Saylor, C.J., concurring and dissenting, joined by Baer and Dougherty, JJ). Finally, Justice Mundy supported the continued application of the three-factor test. **Id**. at 1057 (Mundy, J., dissenting). Thus, after **Hlubin**, the **O'Shea** test remains good law. **See Commonwealth v. Ramsey**, 896 WDA 2020, 2021 WL 5314460, at *6 (Pa. Super. Nov. 16, 2021) (applying **O'Shea** to find suppression would be an inappropriate remedy where the police actions did not deviate from the "letter and spirit" of the MPJA) (unpublished memorandum).

the BOLO. In doing so, he observed a vehicle similar to the description provided and he began to follow it, which led him to briefly leave his jurisdiction. At that time, he observed [Hobel's] vehicle parked in a location where vehicles typically do not park. He turned around to investigate the anomaly when [Hobel] drove away. Officer Lynch then observed him fail to stop at a stop sign and drive in an erratic manner, which created a potential danger to other drivers as he was crossing over into the other lane of traffic. This situation is strikingly similar to the facts addressed by the *Pratti* Court as both police officers observe a vehicle being driven in a dangerous manner and they were outside of their primary jurisdictions. The Pennsylvania Courts and laws of this Commonwealth have never required police officers to ignore potentially dangerous behavior just because they briefly left their jurisdictional boundaries while still on official business. Hence, Officer Lynch had the authority to effectuate a traffic stop, much like the Millvale police officer in *Pratti*, pursuant to 42 Pa.C.S.A. § 8953(a)(5).

TCO at 18 (footnote omitted).

In *Pratti*, an on-duty police officer with the Millvale Borough Police crossed into Shaler Township and turned around in a service station parking lot as was his routine practice. While turning around, the officer heard a loud noise. After hearing the noise, the officer drove further into Shaler Township to investigate and found a stop sign lying in the road with a vehicle ahead of him. Upon seeing the car swerve across the centerline, the officer stopped the car and observed that the driver was intoxicated, following which he summoned the Shaler Police. The driver later claimed the MPJA did not permit his detention by the out-of-jurisdiction officer. Our Supreme Court disagreed, finding that the officer was on "official business" under § 8953(a)(5):

[W]e conclude, based upon the facts presented in the instant matter, that [the officer] was on "official business" as he traveled toward his routine turnaround in Shaler Township. When he heard

- 14 -

what he believed to be an automobile accident, he had an affirmative duty to proceed and investigate in order to make himself available to render assistance if need be. The fact that the occurrence was outside of his jurisdiction does not vitiate his duty to assist if needed; nor does it alter the fact that he continued to be on "official business."

*Pratti*, 608 A.2d at 490.

The Supreme Court came to a similar conclusion the year before in *Commonwealth v. Merchant*, 595 A.2d 1135 (Pa. 1991). There, two Etna Borough police officers were driving in a marked car through Aspinwall Borough as part of their usual routine to reach a limited access highway through Etna. While in Aspinwall, the officers saw the defendant driving in "a very erratic manner crossing the double yellow lines; in fact, almost hitting a vehicle coming in the opposite direction head on." *Id*. at 1135. As a result, the officers pulled over the driver and contacted the Aspinwall Police. Our Supreme Court found that the officers were on "official business" under § 8953(a)(5) when they detained the driver, finding that the officers were on "official business" because "they were on duty travelling their usual route as part of their routine responsibilities." *Id*. at 1139.

Our Supreme Court later revisited the exception in *Lehman*. There, a private citizen stopped a New Wilmington police officer and told him there was a car parked three-quarters of a mile away with its driver slumped over. The officer drove down the road and found the car parked in what turned out to be Wilmington Township, as the driver was slumped over the seat and smelling

- 15 -

of alcohol. The officer radioed the state police and had the driver perform field sobriety tests. State police later showed up and arrested the driver.

The driver filed a motion to suppress based on the police officer detaining him outside the officer's jurisdiction. Our Supreme Court found that the officer's actions were permissible under § 8953(a)(5). *See Lehman*, *supra* at 819-20. Relevant here, after reviewing *Merchant* and *Pratti*, the Supreme Court set forth this rule:

> [S]ection 8953(a)(5) of the MPJA authorizes an extrajurisdictional detention **where the detaining officer is on-duty, outside his or her jurisdiction for a routine or customary reason** including responding to an exigent circumstance, develops probable cause to believe an offense has been committed, and limits out-of-jurisdiction activities to maintaining the *status quo,* including detaining the suspect, until officers from the appropriate jurisdiction arrive.

*Id*. at 821 (emphasis added).

> Applying this rule, the Court stated:

> Excluding the evidence in this case would not advance any of the purposes the MPJA was designed to serve. The legislative intent behind the MPJA-to enable municipal police officers to protect all of the public while maintaining their accountability to local authority-is promoted by allowing [the officer] to take the reasonable steps he did here. The "official duties" of a police officer at times extend outside the home jurisdiction's political boundaries, and appropriate responses to exigencies must be allowed, as the statute acknowledges. Authorizing expedient but limited responses is only common sense; they save lives and property without infringement on anyone's rights.

*Id*.

A year after *Lehman*, the Supreme Court limited the applicability of the exception in *Martin v. Commonwealth, Dep't of Transp., Bureau of*

*Driver Licensing*, 905 A.2d 438 (Pa. 2006). In *Martin*, a police officer was on routine patrol in his jurisdiction when he saw someone driving at what he suspected was a high rate of speed. The officer followed behind while clocking the driver's speed with his speedometer. The officer then followed the driver into a neighboring jurisdiction and saw her make a wide turn. After pulling her over, the officer detected signs of intoxication and arrested the driver. The Supreme Court granted *allocatur* to consider "[w]hether a municipal police officer has authority under the [MPJA] to conduct an extraterritorial arrest of a motorist … where the officer has no grounds for arrest or probable cause in the officer's own jurisdiction but grounds for arrest arise after the officer leaves his jurisdiction in pursuit of the motorist." *Id*. at 437-38.

Holding that municipal officers lack such authority, the Court held the officer was not on "official business" when he followed the driver into the neighboring jurisdiction. The Court noted that the officer's entry into the other jurisdiction was not for official business "separate and apart" from his pursuit of the driver to determine whether she was speeding. *Id*. at 447. As the Court explained, the officer was not in the neighboring jurisdiction "on other official business when he noticed [the driver], nor was he there as part of his routine patrol—for example, a routine, brief entry to allow him to turn around to re-enter his primary jurisdiction—or for any other purpose." *Id*. at 447-48 (footnote omitted). Instead, the officer entered the other jurisdiction "only to

investigate his suspicion that [the motorist] was speeding." *Id*. at 448. Thus, the officer's actions were not authorized under § 8953(a)(5). *Id*.[6]

After review, we find this case is closer to *Pratti*, *Merchant* and *Lehman* than it is to *Martin*. At the suppression hearing, the Commonwealth asked Officer Lynch about his entry into Slippery Rocky Township and whether it was part of his routine patrol.

> Q    Officer, this area that you talked about where you saw the vehicle sitting, you described it … that it goes back and forth between Shenango and some other jurisdictions. Is that correct?
>
> A    Yes, 388 and it's shared in and out through the entire way through Slippery Rock and Shenango.
>
> Q    You are not required to drive around areas that are Slippery Rock?
>
> A    No.
>
> Q    And remain only in your area?
>
> A    No.
>
> Q    So it's not unusual, if you're patrolling, that you're going past this church, I think you described it, and onto Church Road?

---

[6] After *Martin*, this Court has had little opportunity to address the "official business" exception under § 8953(a)(5) in the factual scenario involved here. *See Commonwealth v. Bergamasco*, 197 A.3d 805, 811 (Pa. Super. 2018) ("official business" exception did not apply when police officer was driving back to jurisdiction after a DUI blood draw and the defendant's failure to yield did not pose an immediate clear and present danger); *Commonwealth v. Borovichka*, 18 A.3d 1242, 1249-50 (Pa. Super. 2011) (no MPJA violation where police officer heard call of driver passed out in McDonald's drive-thru a quarter mile beyond his primary jurisdiction); *Henry*, 943 A.2d at 971 (finding technical MPJA violation where arresting officer followed driver into neighboring jurisdiction after viewing only a traffic code violation).

- 18 -

A      No.

Q      You would continue; that would be a regular routine patrol?

A      Correct.

Q      And as part of your regular routine patrol, if you saw a vehicle on a gravel road in an abandoned area, you're not going to call the state police, you would respond?

A      Correct.

Q      Do you have a formal or informal agreement with the townships around you?

A      No.

Q      Do you routinely assist each other in these areas?

A      Yes.

Q      Do you routinely call out to each other and monitor each other's traffic?

A      Yes.

Q      At any point in time, do you specifically ask for help or is this your normal course of routine patrol?

A      It's our normal course of routine patrol.

N.T., 11/28/17, at 44-45.

We agree with the trial court that Officer Lynch was on "official business" when he entered Slippery Rock Township.  Officer Lynch was on duty and in a police cruiser when he crossed into another jurisdiction that was part of his "normal course of routine patrol" to follow behind a dark-colored sedan matching the BOLO when he noticed Hobel parked in an abandoned utility

road. The critical part is that the Commonwealth adduced evidence that Officer Lynch saw Hobel's car in an area near his jurisdiction's border that is part of his routine patrol; if it had not been part of his routine patrol, then this matter would be more like that in *Martin* where the police officer crosses into a neighboring jurisdiction that is not part of his routine patrol. Even still, as set forth by our Supreme Court in *Lehman*, a police officer may act where that officer "is on-duty, outside his or her jurisdiction for a routine or customary reason." *Lehman*, 870 A.2d at 821. Thus, because Officer Lynch followed the dark-colored sedan on a routine part of his routine patrol, he was on "official business" even after he crossed into Slippery Rock Township.

We also agree with the trial court that Officer Lynch, while on "official business," viewed an offense "which presents an immediate clear and present danger to persons or property." At the suppression hearing, Officer Lynch described what he saw after driving past Hobel's car:

> I went up past the vehicle, maybe 75, a hundred yards, turned around in the next driveway up, and as soon as I turned around, the vehicle that was up in the woods turned on the lights, immediately backed out. At that time, I backed out and I was able to get behind the vehicle. The vehicle immediately accelerated, and there's a stop sign at Center Church Road and 388; come out, blew through the stop sign; come out on 388, almost sideways and immediately began to accelerate, which would be north down 388 towards New Butler Road.

N.T., 11/28/17, at 8-9.

Officer Lynch did not put on his emergency lights for the stop sign violation and, instead, waited until he saw Hobel swerve across the road.

…I was behind the vehicle north on 388. The vehicle was all over the road, crossing into [the] oncoming traffic lane, back and forth. That's when I initiated my emergency lights and siren to initiate a traffic stop at that time.

*Id*. at 9. He reiterated the same on cross-examination when asked why he did not pull over Hobel after observing the traffic code violation.

Q      …Why didn't you flick your lights at that point in time when you are saying that you observed a traffic violation?

A      I didn't pull out onto – I just didn't do it. I pulled out on 388, and at that time when the vehicle began to swerve back and forth is when I activated my lights.

*Id*. at 36.

Like Hobel in this case, the defendant in *Merchant* drove in an erratic manner and crossed the double yellow line. *See Merchant*, 595 A.2d at 1135. After finding that the officers were on "official business" when they were outside their jurisdiction, the *Merchant* Court found that "probable cause was established that an offense had been committed which offense [was] a felony, misdemeanor, breach of the peace or other act which present[ed] an immediate clear and present danger to persons or property." *Id*. at 1139 (quotation marks omitted).

Rather than try to stop Hobel after he failed to stop at the stop sign, Officer Lynch waited until he saw that Hobel posed a clear and present danger because of his dangerous driving. Under these circumstances, Officer Lynch's actions were permissible under § 8953(a)(5). *See Commonwealth v. Morris*, 829 A.2d 690, 696-97 (Pa. Super. 2003) (finding § 8953(a)(5) applied

- 21 -

when police officer proceeded through another jurisdiction on his way to his primary jurisdiction for a suspected DUI and saw the motorist driving in an erratic manner); *see also Stein v. Dep't of Transp., Bureau of Driver Licensing*, 857 A.2d 719, 726-27 (Pa. Cmwlth. 2004) (officer had authority under § 8953(a)(5) to pull over motorist because officer observed motorist driving erratically and had probable cause to suspect DUI).

Even if Officer Lynch's actions technically violated the MPJA, suppression would not be appropriate. "In noting the public safety purpose of the MPJA, our Supreme Court has held that a technical violation of MPJA does not always warrant suppression of evidence. Rather, when determining whether suppression is the appropriate remedy, a court should consider the totality of the circumstances of the case." *Commonwealth v. Borovichka*, 18 A.3d 1242, 1249 (Pa. Super. 2011) (citation omitted). "The factors to be considered in applying this case-by-case approach consist of all the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the [MPJA], and the prejudice to the accused." *Commonwealth v. Bergamasco*, 197 A.3d 805, 812 (Pa. Super. 2018) (citation and quotation marks omitted).

As noted, the trial court found suppression was inappropriate after considering all the facts.

> …[F]irst, this police conduct was not significantly intrusive. Officer Lynch did not exercise any police authority outside his jurisdictional limits except perhaps to implicitly intimidate [Hobel] into fleeing. The testimony presented to the Court indicated

Officer Lynch was approximately 100 yards away from [Hobel's] vehicle when [Hobel] initiated his flight, and additionally Officer Lynch had not made any indication of initiating a traffic stop at this point. [Hobel's] reaction to the presence of Officer Lynch, without any action on Officer Lynch's part, cannot be treated as extraterritorial intrusive police conduct.

Second, Officer Lynch's actions did not deviate significantly from the spirit of the MPJA. The circumstances which led Officer Lynch into Slippery Rock legitimately began in his home jurisdiction. Officer Lynch followed a car, in good faith, originating from Shenango, based on information indicating the vehicle fit the description of a suspected vehicle used in a robbery across the border to Slippery Rock Township. There is no evidence Officer Lynch had any level of suspicion of the coming events or that [Hobel] was located in Slippery Rock Township. Officer Lynch discontinued his following of the first vehicle and decided to inspect a strangely parked vehicle. The MPJA is not designed to dissuade this sort of inspection. While no party argues the inspection was based on community caretaking, if the Court were to suppress the evidence, then circumstances like this might occur again, but instead of overlooking a criminal suspect, officers might follow this Court's guidance and overlook a vehicle in distress. This prospective officer may call in the sighting rather than stopping, and may delay needed assistance. This disincentive must be taken into account.

The third factor is whether the search prejudices [Hobel] in that the search would not have occurred without the extraterritorial actions. This factor weighs in favor of [Hobel]. There is no evidence this search was inevitable, and [Hobel] may have gone for a longer period without discovery had Officer Lynch not been present outside his primary jurisdiction.

Taken together, Officer Lynch's good faith in crossing the border, the fact he did not exercise any actual police power to cause [Hobel] to flee, and the relative proximity of the location of the interaction to Officer Lynch's primary jurisdiction lead the Court to find, while a technical violation of the MPJA occurred, the circumstances before the Court do not warrant suppression based on Officer Lynch's actions.

PTO at 14-15.

We find this analysis persuasive. In short, Officer Lynch was on duty in his cruiser and received a BOLO for a car involved in a robbery in a neighboring jurisdiction with which his jurisdiction shares a 911 call center. He then saw a car matching that description while on duty and followed it into a neighboring jurisdiction. As Officer Lynch explained, that road is part of his routine patrol in monitoring traffic because it goes "back and forth" between Shenango and Slippery Rock Townships. When Officer Lynch merely turned around to investigate Hobel's car parked in the woods, Hobel immediately backed out of the abandoned road, drove through a stop sign and then accelerated away while swerving and back and forth across the road. Under these circumstances, suppression would not be an appropriate remedy under the MPJA, the legislative intent of which is to advance public safety and not shield criminal behavior. **See Borovichka**, **supra** at 1250 (holding even if officer technically violated MPJA in assisting in unconscious driver just over his jurisdiction's border, suppression would not be warranted where it would "run afoul of the legislative intent behind the MPJA, which is to promote public safety, not to hinder law enforcement and shield criminal behavior.").

### D. Corporal Hoyland

Hobel next challenges Corporal Hoyland's extrajurisdictional actions in joining the chase even though there was never a request for assistance from Officer Lynch. At suppression, the trial court held that Corporal Hoyland's actions were permissible under § 8953(a)(3) because he had probable cause

to believe that Officer Lynch needed aid or assistance. *See* PTO at 16-17. Furthermore, like it did with Officer Lynch, the trial court determined that suppression would be inappropriate even if Corporal Hoyland technically violated the MPJA. *Id*. at 17-19.

Under § 8953(a)(3), police may act outside their jurisdiction where the officer:

> (i) has been requested to aid or assist a Federal, State or local law enforcement officer or park police officer;
>
> (ii) has probable cause to believe that a Federal, State or local law enforcement officer or park police officer is in need of aid or assistance; or
>
> (iii) has been requested to participate in a Federal, State or local task force and participation has been approved by the police department of the municipality which employs the officer.

42 Pa.C.S. § 8953(a)(3).[7]

Because there was no request for assistance, only § 8953(a)(3)(ii) can permit Corporal Hoyland's actions. Thus, he needed probable cause to believe

_____

[7] At the time of suppression, § 8953(a)(3) permitted extraterritorial police action where "the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance." In July 2019, the Legislature amended § 8953(a)(3) to its current version. *See* 2019, July 2, P.L. 375, No. 58, § 1.1, imd. effective. This amendment applies retroactively to police conduct on or after June 15, 1982. *See* ***Commonwealth v. Forsythe***, 217 A.3d 273, 279 (Pa. Super. 2019) (applying amended version of § 8953(a)(3) to a drug task force roving patrol conducted in June 2015).

that Officer Lynch needed help or assistance. While Officer Lynch did not request assistance, he continued to give updates about the chase.

Q    …Are you still calling out what's happening, what you're seeing?

A    Yes, continued to call out our direction of travel. There [were] other agencies that were monitoring, asking where the location was, where we were at, but at that time, it was still only myself, state police and the officer I was working with.

Q    Do you know what other departments were calling in or checking in?

A    Yeah. It was New Wilmington, Union Township, Hickory Township and New Castle Police Department.

N.T., 11/28/17, at 15.

As Officer Lynch continued to call out, Corporal Hoyland monitored the chase's progress in case Hobel entered New Castle.

…When I turned the scan on, I noted that they were in the middle of a pursuit, so as I was listening, because this went on for an extended time, I could tell that they were starting to possibly come back towards the city, and we always help each other out, neighboring jurisdictions, so I went towards the city line with Shenango Township and I informed my supervisor that I was going there in case they came into our jurisdiction from that area to assist, and I waited there until the pursuit did come towards me.

*Id*. at 50.

Based on these circumstances, the trial court concluded that:

…Corporal Hoyland reasonably could have concluded Officer Lynch was in need of assistance due to Officer Lynch's radio call outs, the extended nature of the chase up to that point, as well as the typical cooperation of these police departments. There was 'fair probability' Officer Lynch required assistance….

- 26 -

PTO at 16-17.

We find no error in this analysis under these circumstances where a high-speed chase crossed multiple jurisdictions and the lead officer continued to call out his position but never requested assistance. To conclude otherwise would run afoul of the legislative intent of the MPJA, which we liberally construe to give effect to its purposes. *See Commonwealth v. Peters*, 965 A.2d 222, 274-75 (Pa. 2009). Among these purposes, the MPJA is intended to "promote public safety while maintaining police accountability to local authority; it is not intended to erect 'impenetrable jurisdictional walls benefit[ing] only criminals hidden in their shadows.' " *Lehman*, *supra* at 820 (quoting *Merchant, supra* at 1139). Corporal Hoyland monitored the chase and positioned himself to intercept it if it entered his jurisdiction. While the chase came near his position but veered off, he still had probable cause to believe Officer Lynch needed assistance in concluding the chase as it had continued to wear on. We, thus, find that the trial court properly concluded that Corporal Hoyland's actions were authorized under § 8953(a)(3)(ii).

Moreover, we find suppression would not be warranted even if Corporal Hoyland technically violated the MPJA. In its pretrial opinion, the trial court applied the three-factor *O'Shea* test and found the first and third factors weighed against suppression while the second was in Hobel's favor:

> First, the police conduct in this case was not significantly intrusive. Corporal Hoyland did not intercept the chase very far outside his jurisdiction. The path of the chase was also proceeding along the 422 Bypass, which proceeds through [New Castle Police]

jurisdiction. The next exit off of the 422 Bypass in the direction of travel was in Taylor Township, which was jurisdictionally covered by the NCPD. (Omnibus Pretrial Hearing, November 28, 2017 p. 67). As long as the chase proceeded in that direction and did not stop, it inevitably would have passed through [New Castle Police] jurisdiction. The chase did in fact proceed through Corporal Hoyland's jurisdiction along this route.

The second factor weighs in favor of [Hobel]. Corporal Hoyland's action of joining in the chase which started outside of his jurisdiction, while not intrusive, moderately deviates from the letter and spirit of the [MPJA]. The MPJA is designed to create a somewhat permeable membrane replacing the hard walls of borders such that good faith police conduct is not punished. It is also designed to foster cooperation among departments. Corporal Hoyland took up position just outside of his jurisdiction when the chase was possibly going to pass near to his jurisdiction. While the chase eventually did pass through his jurisdiction, he joined the chase before it did so. Corporal Hoyland testified he waited at the border of Shenango Township and New Castle for approximately 30 minutes before he got involved in the pursuit. The chase was proceeding before this time as well. In circumstances like this, following the spirit of the MPJA would require Corporal Hoyland or some other appropriate individual at the [New Castle Police] to contact Shenango Township Police Department to receive permission to join in the pursuit should it approach the New Castle border. No evidence was presented to the Court this action was taken.

Third, with regard to Corporal Hoyland, the accused suffered little to no prejudice from the MPJA violation. Corporal Hoyland was not the first or sole pursuer. Officer Lynch was also following the Defendant's vehicle when Corporal Hoyland joined and Officer Lynch was communicating with several other police departments who were monitoring the status of the pursuit. The Court cannot presume [Hobel] would have escaped this dragnet.

PTO at 17-19.

As this thoughtful analysis highlights, while Corporal Hoyland did not ask for approval to the chase, his late entry as it passed near his jurisdiction was not significantly intrusive and did not prejudice Hobel as he led Officer

Lynch and the other officers on a harrowing chase. Under such circumstances, even if there had been a technical violation MPJA, suppression would be inappropriate, and to conclude otherwise would be a result not contemplated by the MPJA and its legislative intent.

To sum it up, Corporal Hoyland's actions were authorized under § 8953(a)(3)(ii). Further, even if those actions were not authorized, suppression would be inappropriate under *O'Shea*. Thus, Hobel's suppression challenge fails.

### III. Joinder

Hobel next argues that the trial court erred in joining his four cases for trial. He contends that the jury could not separate the evidence in the three robbery cases, as none of the clerks that testified about the robberies could identify him. He then highlights certain discrepancies between the clerks' descriptions of the robber and asserts that this shows that the robberies were committed by different perpetrators. As a result, he believes, the robberies were not sufficiently similar enough to warrant the trial court joining them for trial.

"The general policy of the laws is to encourage joinder of offenses and consolidation of indictments when judicial economy can thereby be effected, especially when the result will be to avoid the expensive and time consuming duplication of evidence." *Commonwealth v. Johnson*, 236 A.3d 1141, 1150 (Pa. Super. 2020) (citation omitted). "Whether to join or sever offenses for

trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant." ***Commonwealth v. Knoble***, 188 A.3d 1199, 1205 (Pa. Super. 2018) (citation omitted).

Pennsylvania Rule of Criminal Procedure 582 provides, in pertinent part:

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1).

Pennsylvania Rule of Criminal Procedure 583 provides:

The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

Pa.R.Crim.P. 583. "Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." ***Commonwealth v. Dozzo***, 991 A.2d 898, 902 (Pa. Super. 2010).

The prejudice of which Rule 583 speaks is, rather, that which would occur if the evidence tended to convict the appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence. Additionally, the admission of relevant evidence connecting a defendant to the crimes charged is a natural consequence of a criminal trial, and it is not grounds for severance by itself.

*Id*. (citation omitted).

Reading Rules 582 and 583 together, our Supreme Court has established this three-part test concerning joinder and severance:

> [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

***Commonwealth v. Collins***, 703 A.2d 418, 422 (Pa. 1997) (citation omitted).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). Nevertheless:

> Evidence of other crimes is admissible to demonstrate (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) the identity of the person charged with the commission of the crime on trial. Additionally, evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts.

***Collins***, ***supra*** at 422-23; ***see also*** Pa.R.E. 404(b)(2).

With these standards in mind, the trial court gave a concise summation of its reasoning in joining Hobel's four cases:

> The current cases, which were consolidated for trial, consist of three robberies and a vehicle pursuit with the first robbery having occurred at Market 24 convenience store on December 11, 2016, and the final robbery occurred at the Main Street Market on December 12, 2016. These events culminated with a high-speed vehicle pursuit in the early morning hours of December 13, 2016. In all three of the robberies, [Hobel] was wearing a gray hooded

sweatshirt, blue jeans, blue tennis shoes with lime green trim and a black mask to obscure his face. He then pointed what appeared to be a black handgun at the store clerks. [Hobel] then would receive the money retrieved by the store clerks and exit the facility. The robberies were committed in similar manners and [Hobel] used what appeared to be the same weapon to effectuate the robberies. Evidence of each robbery would have been admissible in separate trials for the other as the Commonwealth could have presented them to establish modus operandi. That evidence would demonstrate a specific pattern or practice of criminal activity to prove they were perpetrated by the same person.

Moreover, evidence of the vehicle pursuit was admissible in the trial concerning the robberies as evidence of the robberies were discovered after the pursuit when [Hobel's] vehicle was searched. In this instance, it would have been extremely difficult to separate the robberies and the vehicle pursuit into separate trials. In addition, the facts presented at trial were not confusing or complex to an extent it caused confusion amongst the jury in distinguishing the episodes of criminality….

TCO at 20-21.

We discern no abuse of discretion in this analysis. This matter involved three convenience store robberies that were temporally and geographically linked: the robberies were committed over a compressed 40-hour period of each other within a few miles of each other in the same county. Additionally, each robbery was captured on video which showed that the robber was a white male wearing a gray hoodie with a black hoodie underneath, wore a black mask and brandished what looked like a black semiautomatic handgun. Moreover, as the trial court noted, similar items were found in Hobel's car after the car chase. On top of that, Hobel told Heemer that he could not pull over because he had committed robberies and had things in the car connecting

him to the robberies. *See* N.T., 9/25/ 19, at 10-11. Accordingly, Hobel's joinder challenge fails. *See Dozzo*, *supra* at 903-04 (no abuse of discretion where trial court joined seven robbery cases in which the robberies took place within a one-month period; all occurred at or near train stations late in the evening or at night; and the perpetrator possessed a gun or boasted he possessed one).

### IV. Sufficiency of the Evidence

Hobel next challenges the sufficiency of the evidence in his robbery cases, arguing the Commonwealth presented insufficient evidence because none of the three clerks could identify him at trial as the robber. Hobel believes that this lack of identification trumps the Commonwealth's circumstantial evidence recovered after the chase that he committed the robberies. To this end, he highlights various discrepancies between the clerks' descriptions of the robbery and argues that these discrepancies, when coupled with the lack of any identification or forensic evidence linking him to the robberies, show that the Commonwealth failed to present sufficient evidence to convict him in the three robbery cases.[8]

_____

[8] Our standard of review for sufficiency challenges is well-established:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh

The Commonwealth's evidence for the first robbery was as follows. On December 11, 2016, at around 3:45 a.m., Officer Joshua Covert of the New Castle Police was dispatched for a robbery that just occurred at a mini mart located at 719 East Washington Street in New Castle. *See* N.T., 9/24/19, at 32-33. Upon arriving, Officer Covert spoke to the clerk. *Id*. at 33. The clerk described the robber as a "thin white male, about six foot tall, wearing a gray hoodie, blue jeans and he had a black – what appeared a black and white bandana-style mask covering his face." *Id*. At trial, the Commonwealth showed video of the robbery. *Id*. at 34-38. The footage shows the robber walk in the store with what looks like a black semiautomatic handgun and demand money from the clerk's cash register. The robber can be seen wearing

---

the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Williams*, 255 A.3d 565, 578-79 (Pa. Super. 2021) (citation omitted).

a gray hoodie with a black hoodie underneath and blue jeans, as well as shoes with, as Office Covert described at trial, "bright coloring." *Id*. at 40.

The second robbery was committed around 11:00 p.m. on December 11, 2016. Around that time, Officer Richard List of the Ellwood City Police received a call for a robbery at the Uni-Mart located at 600 Beaver Avenue in Ellwood City. *Id*. at 59. When he arrived, Officer List spoke to the clerk, who described the robber as a "white, tall, slender male wearing a gray hoodie with a zip front with like a black hoodie and a black mask underneath and the only thing that was showing was his eyes." *Id*. at 60. Video of the robbery shows the robber entering the store and holding what looks like a black semiautomatic handgun while wearing a gray zip-up hoodie with a black hoodie underneath and a black mask. *Id*. at 64-65. After the clerk gives the money, the robber asks for five packs of cigarettes, which the clerk testified were Newport 100s. *Id*. at 65, 80.

The third and final robbery happened around 7:00 p.m. on December 12, 2016. At that time, Officer Robert Newtown of the New Castle Police was dispatched to the Main Street Market located at 309 Center Avenue in West Pittsburgh, which is covered by New Castle Police. *Id*. at 94, 103. At the store, the clerks described the robber as a "white male wearing a mask with a dark in colored shirt," with a black semiautomatic handgun. *Id*. at 95. Like the other robberies, the Commonwealth showed video of the robbery. *Id*. at 96. In the video, the robber is wearing a gray hoodie with a black hoodie

underneath, blue jeans, a black mask and bluish shoes with bright shoelaces and trim, which the clerk described at trial as "bright-colored." *Id*. at 106. The robber pulls out what looks like a black semiautomatic handgun and directs the clerks to give him money out of the cash register. After getting the money, the robber runs out as the clerk follows him out of the store.

Turning to the police chase in the early morning hours of December 13, 2016, the Commonwealth called Heemer as a witness. She testified that just before the chase she and Hobel were in his car doing drugs. *See* N.T., 9/25/19, at 9. When she got out of the car, Hobel pulled her back in and said he just saw a cop drive by and that they were looking for his car. *Id*. Hobel then admitted to her that for "the last couple weeks, he had been robbing places for alcohol, drugs, cigarettes and gas." *Id*. at 10. He told her that the cigarettes and money he had in the car had come from robbing gas stations. *Id*. at 60. Then, after the chase began, Hobel started screaming at her that he could not pull over because "there was stuff in the car and he would get caught" and that "they had him on camera." *Id*. at 10-11.

The Commonwealth also admitted evidence of the clothing and items discovered in Hobel's car after the chase. These included, among other things, a gray-hooded sweatshirt, another gray zip-up hooded sweatshirt, a black hooded sweatshirt, a black airsoft handgun, a pullover mask, a ski mask and a pack of Newport 100s. *Id*. at 124-132. The Commonwealth also admitted

evidence about the clothing recovered from Hobel at the hospital after he was shot. This included Hobel's blue shoes with neon-green laces. *Id*. at 135.

Viewing this evidence in the light most favorable to the Commonwealth as the verdict winner, we find there was sufficient evidence to convict Hobel of the three robberies. Hobel's challenge essentially concedes all the material elements of the offenses except for identity. While admittedly none of the clerks could identify him as the robber at trial, the Commonwealth presented sufficient evidence to prove (1) that the same man committed the three robberies, and (2) that Hobel was that man.

First, after viewing the video surveillance of the three robberies, the jury could conclude that the same man committed each offense. Besides the offenses being committed close in time and location, each video depicts the robber wearing the same clothes: a gray-hooded sweatshirt with a black-hooded sweatshirt underneath, blue jeans and a black mask. Likewise, in each case, the robber brandishes what looks like a black semiautomatic handgun in his right hand during the robberies. Based on these similarities, it was well within the jury's province to conclude that the same person committed all three robberies rather than, as Hobel suggests, multiple perpetrators.

Second, the Commonwealth presented more than ample evidence to establish that Hobel was, in fact, the man that committed the three robberies. The robber's clothing, masks and handgun matched the clothing, masks and

black airsoft handgun found in Hobel's car. Moreover, in the backseat of Hobel's car, the police found a box of Newport 100s—the same brand of cigarette that the robber requested in the second robbery. Additionally, in two of the robberies, the robber was wearing distinctive blue shoes with bright laces and trim that would resemble those recovered from Hobel after the chase. While any one of these facts could be construed as innocuous in isolation, the jury was free to consider them together in concluding that they were the same clothing and items possessed by the robber seen in the video surveillance. This conclusion was strengthened by Heemer's testimony that Hobel admitted that the items in his car were from robberies and that was why he was fleeing from the police. For all these reasons, Hobel's sufficiency challenge fails.

## V. Weight of the Evidence

In his final issue, Hobel alleges that the trial court erred in denying his post-sentence motion for new trial based on the jury's verdicts being against the weight of the evidence.[9] In so doing, Hobel essentially rehashes his

---

[9] As this Court has explained:

> [A]ppellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence.

sufficiency argument by emphasizing that none of the clerks identified him at trial as being the man who robbed the convenience stores.  He also assails the credibility of Heemer's testimony, noting that there were several inconsistencies between her testimony at trial and a statement that she gave to the police after the chase.  Finally, he contends that the items discovered in his car (clothing, black airsoft gun, masks, cigarettes) are common items that had other explanations for being there rather than necessarily being used in the robberies.

After review, we find no abuse of discretion by the trial court in denying Hobel's weight of the evidence challenge.  As recounted in our discussion of the sufficiency of the evidence, the Commonwealth presented ample evidence that the three robberies were committed by the same perpetrator, including

Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Furthermore, in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Delmonico*, 251 A.3d 829, 837 (Pa. Super. 2021) (internal citations, quotations, and brackets omitted).

video surveillance showing that the robber wore the same clothing for each offense. The Commonwealth then presented ample evidence proving that Hobel was, in fact, the perpetrator even though none of the clerks could identify him in court because he wore a mask during the robberies. The Commonwealth accomplished through Heemer's testimony about what Hobel admitted to her during his flight from the police, as well as the items recovered in his car after the chase, which included similar clothing to the robber, a black airsoft gun, masks and cigarettes of the same brand asked for during one of the robberies. Again, as we emphasized above, while none of these pieces of evidence in isolation would establish the case, the jury was free to consider them together in finding that Hobel committed the robberies. Accordingly, we hold that Hobel's weight of the evidence challenge fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  05/10/2022