J-A26043-22
J-A26044-22
J-A26045-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TERRELL K. CARTER | : | |
| | : | |
| Appellant | : | No. 46 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 20, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000559-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TERRELL K. CARTER | : | |
| | : | |
| Appellant | : | No. 47 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 20, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000560-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TERRELL K. CARTER | : | |
| | : | |
| Appellant | : | No. 48 EDA 2022 |

J-A26043-22
J-A26044-22
J-A26045-22

Appeal from the Judgment of Sentence Entered October 20, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000603-2021

BEFORE: BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED NOVEMBER 29, 2022**

Terrell K. Carter (Carter) appeals from the October 20, 2021 judgments of sentence[1] imposed by the Court of Common Pleas of Philadelphia County (trial court) following his convictions by jury of two counts each of first-degree murder, carrying a firearm without a license and carrying a firearm on the streets of Philadelphia, and one count each of attempted murder and aggravated assault.[2] We affirm.

**I.**

We glean the following facts from the certified record. On August 27, 2018 (the August shooting), Steven Mosley (Mosley) and Roderick Williams (Williams) contacted Carter to purchase methamphetamine. They had

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Carter's notices of appeal purported to appeal from the trial court's December 1, 2021 order denying post-sentence motions. "In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." ***Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*). We have corrected the captions accordingly.

[2] 18 Pa.C.S. §§ 2502(a), 6106, 6108, 901 & 2702.

- 2 -

purchased narcotics from Carter on at least two prior occasions. Mosley texted back and forth with Carter throughout the night and originally arranged to meet him in the Nicetown section of Philadelphia. When he and Williams arrived at the meeting point, Carter directed them to a ShopRite in the Roxborough section of the city. When they reached that location, Carter was driving a Jeep Cherokee[3] and directed them to follow him.

They proceeded to a nearby residential street and parked their vehicles. Carter then entered the backseat of Mosley's vehicle. Mosley and Williams gave him $2,500 in cash, which he counted before going back to his vehicle to retrieve the methamphetamine. However, when Carter returned to Mosley's vehicle, he immediately fired several shots into the driver's side window. Mosley was killed instantly and Williams, after being struck in the thigh, pretended to be dead. When Carter began to walk back to his vehicle, Williams attempted to exit Mosely's vehicle. Carter returned and fired several more shots at Williams before running to his vehicle and fleeing the scene.

Neighbors called the police and reported that the shooter had left the scene in a Jeep heading northbound toward Henry Avenue. Williams was taken to the hospital and treated for his injuries. When he was interviewed by police that night, he did not immediately name Carter as the assailant but

---

[3] Williams reported that on prior occasions, he had seen Carter driving a white BMW.

did provide a description of Carter and his vehicle. In an interview in January 2019, after Carter had been arrested, Williams identified Carter as the shooter.

Detectives recovered Mosley's cell phone from the crime scene and analyzed the activity leading to the shooting. Mosley had communicated with a phone number that was saved as "Rell the Man" and exchanged text messages to establish a time, meeting place and price for the sale.[4] N.T., 10/14/21, at 98. Additional text messages and phone calls later in the evening corroborated Williams' account of meeting at the ShopRite before following Carter to the second location where the shooting occurred.

Upon further investigation, detectives identified Carter as the owner of the "Rell the Man" phone number and learned that he lived at an apartment complex on Henry Avenue. A Jeep Cherokee registered to Carter was located at the address. Surveillance video from the apartment complex showed the vehicle leaving the complex at approximately 9:46 PM and returning at 10:26 PM on the night of the murder, which matched the time frame of the shooting. The complex was located approximately half-a-mile from the crime scene. Detectives also located video from a private residence near the scene of the shooting that showed an individual park his vehicle, walk out of frame

---

[4] In the biographical information sheets completed at the time of his arrests in the two cases, Carter listed "Rell" as his nickname and listed the "Rell the Man" phone number as his own.

for a few minutes, return briefly to his vehicle before leaving the frame again and finally running back to the vehicle and driving away.

On September 13, 2018 (the September shooting), Rafiq Turner (Turner) was shot and killed while seated in the driver's seat of his vehicle. Shanya Lovett (Lovett), Turner's sister, had spoken with him the day before and he told her he was planning to meet Carter to purchase narcotics. Turner and Lovett both knew Carter because they previously lived in the same neighborhood. Turner showed her a backpack containing a large amount of cash in twenty-dollar bills bound in rubber bands. After the murder, police recovered an empty backpack from the front seat of the vehicle.

Zarriah Stone (Stone), Carter's stepdaughter, reported that around the time of the September shooting, she entered Carter's vehicle and found a roll of twenty-dollar bills next to the passenger's seat. She gave the money to Carter, who gave her $20 from the bundle to thank her for locating it. Zabre Carter (Zabre),[5] Carter's wife, also reported that around the time of the murders Carter had given her $3,200 to make a payment on her white BMW, which had been repossessed.[6] He had also given her approximately $900 for

_____

[5] For clarity, we refer to Zabre by her first name.

[6] A Western Union receipt recovered from Zabre and Carter's residence confirmed that the car payment was transferred the day after Turner's murder.

rent. Carter's bank records revealed that he had deposited $5,000 into his own account the morning after the September shooting.

Detectives recovered a cell phone from Turner's vehicle and analyzed it for any communications with Carter's phone number,[7] which was saved in Turner's phone under the name "RC." N.T., 10/18/21, at 126. The contact was created on the day of the murder and there were 13 phone calls and approximately 37 text messages between the two devices. Shortly after 7 PM, Turner texted Carter's phone that he was "on [his] way" and the two phones then connected for a four-minute FaceTime video call. *Id.* at 140. A few minutes later, Carter's phone texted a street address to Turner. Two final, brief calls occurred between the phones at 8:29 PM and 8:43 PM. At 8:57 PM, law enforcement was dispatched to the scene of the shooting, which was a little over a mile away from the address that had been texted to Turner.

Law enforcement also retrieved surveillance video footage from the Henry Avenue apartment complex during this time frame. The complex was approximately 6.4 miles from the scene of the September shooting. Surveillance video captured Carter's Jeep returning to the complex at 9:11 PM. Additionally, analysis of Carter's phone's historical data showed that it was within range of a cell phone tower that covered the crime scene at

_____

[7] This was the same phone number saved in Mosley's phone as "Rell the Man." Zabre additionally told police that the phone number belonged to Carter.

8:43 PM. The phone then moved toward a tower that covered Carter's apartment complex at 8:56 PM.

Prior to trial, the Commonwealth filed a motion to consolidate the August shooting and the September shooting cases pursuant to Pa.R.Crim.P. 582(A)(1) and 404(b)(2).[8] It argued that Williams' identification of Carter as his assailant in the August shooting was relevant and probative of Carter's involvement in the September shooting. In both cases, the victims communicated with Carter's phone number to arrange a drug deal and were subsequently shot in their vehicles during the transaction. Large amounts of money intended for the narcotics purchases were stolen from the victims. The shootings occurred in an area of town where Carter had previously lived and had met with Mosley. They occurred approximately two weeks apart. The Commonwealth argued that the cases should be consolidated based on their similarities and to establish Carter's identity and motive as the perpetrator of the September shooting, as there were no eyewitnesses to that incident.

Carter argued that the cases should not be consolidated because it was overly prejudicial and the jury would not be able to separate the evidence in

---

[8] For reasons unclear from the record, Carter was charged at separate docket numbers for the murder of Mosley and the attempted murder of Williams, even though the charges arose from the same incident. Accordingly, three docket numbers were at issue in the trial court. The parties' arguments related to consolidating the cases for trial focus on the joinder of the August shooting and the September shooting, as they were separate transactions.

the August shooting from the September shooting. Relying on Pa.R.Crim.P. 404(b), the trial court concluded that the evidence in the August shooting would be admissible in the trial for the September shooting to establish identity, motive and a common scheme. It granted the Commonwealth's motion and consolidated the cases for trial.

Carter proceeded to a jury trial and was convicted of the above-mentioned offenses. He was immediately sentenced to two consecutive terms of life imprisonment on the counts of first-degree murder. For the counts related to the August shooting, he was sentenced to concurrent terms of 2.5 to 5 years' imprisonment each for carrying a firearm without a license and carrying a firearm on the streets of Philadelphia, and 10 to 20 years' imprisonment for the attempted murder of Williams. Related to the September shooting, he was sentenced to concurrent terms of 2.5 to 5 years' imprisonment each for carrying a firearm without a license and carrying a firearm on the streets of Philadelphia.

Carter filed timely post-sentence motions challenging the weight of the evidence to support his convictions and the consolidation of the cases for trial. The trial court denied the motions and Carter timely appealed. He and the trial court have complied with Pa. R.A.P. 1925.

## II.

In his first issue on appeal, Carter argues that the trial court abused its discretion by denying his request for a new trial because his convictions for

the September shooting were against the weight of the evidence.[9] He contends that the only evidence linking him to the September shooting was the phone number that communicated with Turner prior to his murder. He points out that there were no eyewitnesses to the September shooting and contends that the Commonwealth could not establish based only on the text conversations that he was the perpetrator in that incident.

"An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Sullivan*, 820 A.2d 795, 805-06 (Pa. Super. 2003) (citation omitted). "Trial judges, in reviewing a claim that the verdict is against the weight of the evidence, do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000) (quotations omitted). A new trial is appropriate only when the verdict "is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Olsen*, 82 A.3d 1041, 1049 (Pa. Super. 2013) (citation

---

[9] When evaluating a challenge to the weight of the evidence to support a conviction, this Court does not reweigh the evidence presented at trial, but rather evaluates the trial court's denial of the motion for a new trial for an abuse of discretion. *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). A trial court's determination that the verdict was not against the weight of the evidence is "[o]ne of the least assailable reasons for granting a new trial." *Id.* (citation omitted).

omitted). "[T]he evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019) (*en banc*) (citation omitted).

Carter does not address his argument to the trial court's exercise of discretion in denying his post-sentence motion. Rather, he asks this Court to reweigh the evidence against him and find that his text messages and phone calls to Turner immediately prior to the murder have insufficient weight to support his convictions. This argument misapprehends our scope and standard of review on appeal, as we may not reweigh the evidence or disturb the trial court's determinations without a clear abuse of discretion. *See Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013).

The trial court's opinion reveals no such abuse of discretion. *See* Trial Court Opinion, 3/2/22, at 11-12. Carter's cell phone number was far from the only evidence linking him to the September shooting. Turner spoke with his sister the day before his murder and told her that he planned to purchase narcotics from Carter the following day. He showed her a backpack with the cash he intended to use to purchase the drugs, and an empty backpack was found in his vehicle after his murder. The day after the shooting, Carter gave his wife $3,200 and deposited $5,000 in his own bank account, and around that same time Stone found a roll of cash in Carter's vehicle.

Carter confirmed to police at the time of his arrest that the phone number that communicated with Turner about the drug sale was his own.

- 10 -

Analysis of the number's historical data showed that the phone was in the vicinity of the crime scene around the time of the September shooting, after which it moved toward the apartment complex where Carter lived. Surveillance video at the apartment depicted Carter's vehicle returning to the apartment complex shortly after the shooting. Finally, the September shooting occurred less than three weeks after the August shooting and bore substantial similarities to that incident, and Williams testified that Carter was the perpetrator of the August shooting. The trial court concluded that taken together, the weight of this evidence was not so vague, tenuous and uncertain as to require a new trial. **Akhmedov**, **supra**. The record supports this determination and no relief is due.

## III.

Next, Carter argues that the trial court abused its discretion in consolidating the trials for the August shooting and the September shooting.[10] He argues that joinder of the two incidents for trial improperly suggested to the jury that he had a "propensity to commit robbery-murders." Carter's Brief at 10. He argues that no eyewitness was presented for the September shooting and the phone number saved as "Rell the Man" and "RC" in the

---

[10] "Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant." **Commonwealth v. Knoble**, 188 A.3d 1199, 1205 (Pa. Super. 2018) (quoting **Commonwealth v. Wholaver**, 989 A.2d 883, 888 (Pa. 2010)).

victims' phones could not be conclusively linked to him. He contends that the jury could not separate the evidence from the two murders and consider them individually. We disagree.

Offenses charged based on different criminal acts or transactions may be joined for trial if "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion." Pa.R.Crim.P. 582(A)(1). A court may order separate trials if a party would be prejudiced by joinder, even when it is otherwise appropriate under the Rules. Pa.R.Crim.P. 583.

> Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime. . . . The prejudice of which Rule 583 speaks is, rather, that which would occur if the evidence tended to convict the appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence.

*Commonwealth v. Hobel*, 275 A.3d 1049, 1067 (Pa. Super. 2022) (quoting *Commonwealth v. Dozzo*, 991 A.2d 898, 902 (Pa. Super. 2010)).

The Commonwealth argued in the trial court that joinder of the August shooting case and the September shooting case was proper to establish Carter's identity as the shooter in both instances and to show a motive and common plan or scheme underlying the shootings. While it is well-established that evidence of other crimes or bad acts is not admissible to show a defendant's propensity to commit crimes, such evidence is admissible for other purposes, "such as proving motive, opportunity, intent, preparation,

plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(1)-(2).

In **Hobel**, the trial court consolidated four of the defendant's cases for trial: the first three were robberies of different stores that occurred over a 40-hour period and the fourth case was a high-speed vehicle chase with the police that resulted in the defendant's arrest. The robberies were each captured on surveillance video which showed the defendant in the same clothing and pointing a black handgun at the store clerks. The stores were located within a few miles of each other. Following the car chase, police located items of clothing and a black airsoft gun resembling those seen in the videos in the defendant's vehicle. This Court affirmed, finding that joinder was proper because evidence in each case would be admissible in a trial for the others to establish the identity of the perpetrator of the robberies through the common pattern of criminal activity. **Id.** at 1068.

The same reasoning applies here. As the trial court explained, the August shooting and September shooting shared substantial similarities that suggested a single perpetrator had committed both crimes. The victims had both communicated with the same phone number to arrange to purchase narcotics. The shooter directed the victims to meet him at a specific address and then led them to a second location to complete the transaction. Both victims were shot in the head while seated in the driver's seat of their vehicles. Williams testified that he and Mosley had given Carter the money for the

methamphetamine before he returned to his vehicle to retrieve the narcotics. He and Mosley were then shot when Carter returned to the driver's side window of their vehicle, ostensibly to bring them the drugs. While there were no witnesses to the September shooting, the empty backpack in Turner's vehicle that had previously been full of cash suggested a similar turn of events. Finally, both shootings occurred within a short drive of Carter's apartment complex and surveillance video captured him returning to that address shortly after each shooting. The trial court did not abuse its discretion in concluding that the similarities between the two shootings were probative of Carter's identity and motive as the shooter in the September shooting.

Additionally, the jury was capable of separating the evidence from the two shootings and evaluating each case on its own merits. The shootings involved different victims and occurred on different dates approximately two-and-a-half weeks apart. The Commonwealth presented all evidence of the August shooting first, followed by all evidence related to the September shooting, even when this approach necessitated calling the same witness on two separate days to testify regarding each shooting. *See* N.T., 10/14/21, at 84-145 (Detective Thorsten Lucke testifying regarding the cell phone evidence in the August shooting); N.T., 10/18/21, at 119-60 (Detective Lucke testifying regarding the cell phone evidence in the September shooting). The trial court also issued a cautionary instruction to the jury that "the evidence pertaining to the separate cases must not be regarded as evidence tending to show that

the Defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt." N.T., 10/19/21, at 122. It explained that the cases were tried together to show similarities between the crimes but that the jury retained the sole discretion of determining whether Carter was the perpetrator. Based on these circumstances, we cannot conclude that the jury would have been incapable of evaluating each case separately or that Carter was prejudiced by the joinder of the cases for trial.

Judgments of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2022