J-A08016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                    :             PENNSYLVANIA
                                    :
              v.                       :
                                    :
                                    :
SHAWN DAVID KITCEY                  :
                                    :
             Appellant           :        No. 775 WDA 2022

Appeal from the Judgment of Sentence Entered May 13, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002049-2018

BEFORE:    STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:           **FILED: September 8, 2023**

Shawn David Kitcey ("Kitcey") appeals from the judgment of sentence imposed following his convictions for, *inter alia*, person not to possess a firearm and possession with intent to deliver ("PWID").[1] We affirm.

The factual and procedural history of this case is as follows.[2] Lake City Borough Police Department Patrol Officer James Mark Pettinato was on duty on Friday, April 20, 2018, in uniform and in a marked patrol vehicle. **See** N.T., 11/30/21, at 5-6. Officer Pettinato was on patrol in a school zone, observing traffic. **See id**. at 6. Officer Pettinato was stationed at the Elk Valley school on Maple Avenue in Lake City. **See id**. at 7. He was located on

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. § 6105(a)(1); 35 P.S. § 780-113(a)(30).

[2] We begin with the facts as gleaned from the suppression hearing record.

the north end of the school on the Lake Street side, "watching the traffic going from east to west." *Id*. The speed limit in the zone Officer Pettinato was observing was fifteen miles per hour. *See id*. Outside of the school zone, the speed limit increases to thirty-five miles per hour. *See id*. at 13.

Officer Pettinato explained that, from his position at the school, he watches for speeding vehicles and also "run[s] . . . [license] plate[s] to see who's coming in and out of the school zone, just for the safety of the area of the school." *Id*. at 8. Officer Pettinato further elaborated that he has a computer in his vehicle which he uses to access a database that he uses to obtain information about vehicles. *See id*. at 9. It takes between approximately thirty seconds to a minute for information to come back from the database. *See id*. A little after 8:00 a.m., Officer Pettinato ran a license plate for a maroon Toyota vehicle, discovered it was expired, and pulled out to follow that vehicle to conduct a traffic stop. *See id*. at 8, 10, 28.[3] Officer Pettinato pulled out from his position to follow the vehicle with the expired registration approximately thirty to sixty seconds after entering the information into his computer, and, as he noted, because "there's traffic, obviously, by the school zone, . . . it did take me a while to catch up to the vehicle." *Id*. at 10. Officer Pettinato estimated it took "two minutes, at the

---

[3] Kitcey had been driving the speed limit. *See* N.T., 11/30/21, at 17.

most[,]" for him to stop Kitcey following his observation of the violation. *See id*. at 26.

Officer Pettinato caught up with the maroon Toyota on Elk Park Road and effected a traffic stop on Route 20 by engaging the lights on his vehicle. *Id*. at 11. As Officer Pettinato engaged the lights, he notified dispatch of the stop. *See id*. at 25. The location of the traffic stop was in Girard, Pennsylvania, approximately 2.6 miles from where Officer Pettinato had first observed the vehicle with expired registration in Lake City, Pennsylvania. *See id*. at 19.[4]

"Shortly after" Officer Pettinato "conducted" the stop, an officer from the Girard Borough Police Department, Patrol Officer Nickolas Henneberry, arrived on the scene and worked in conjunction with Officer Pettinato. *See id*. at 12. Officer Pettinato approached the vehicle and conversed with the driver, Kitcey, who gave Officer Pettinato his identification. *See id*. Kitcey was the only one in the car at the time. *See id*. Officer Pettinato checked Kitcey's information and learned that Kitcey had outstanding warrants. *See id*. at 11-12. Officer Pettinato informed Kitcey about the warrants and asked

---

[4] Officer Pettinato could not be sure when he first turned on his overhead lights. *See* N.T., 11/30/21, at 25-26. However, he testified that he first caught up to Kitcey somewhere between the school and Route 20, more specifically, on Elk Park Road. *See id*. at 11, 29. The intersection of Elk Park Road and Route 20 is in Girard. *See id*. at 19. Officer Pettinato followed Kitcey to Route 20 so he could have a cross street to convey to dispatch, so his location would be documented for safety purposes. *See id*. at 26, 29-30.

him to step out of the vehicle, but, instead, Kitcey drove away. *See id*. Officers Pettinato and Henneberry pursued and ultimately apprehended Kitcey. *See id*. at 32.

Following his apprehension, the circumstances of which are more fully discussed below, officers charged Kitcey with, *inter alia*, person not to possess a firearm and PWID. Kitcey later moved for suppression, arguing at the hearing, principally, that Officer Pettinato stopped Kitcey's vehicle outside of the officer's primary jurisdiction in violation of the Municipal Police Jurisdiction Act ("MPJA").[5] *See generally* Omnibus Motion for Pre-Trial Relief, 9/7/21; *see also* N.T., 11/30/21, at 21 (Kitcey arguing the stop was in violation of the MPJA). Following a suppression hearing, at which Officer Pettinato testified to the events leading up to the vehicle stop, the trial court denied Kitcey's motion. *See* Opinion and Order, 12/29/21. The case then proceeded to a jury trial.

Officer Pettinato testified at trial to the next sequence of events.[6] Officer Pettinato observed Kitcey put his vehicle in drive; he ordered Kitcey "multiple times" to stop, but Kitcey disregarded the commands, and proceeded to drive off. N.T., 2/16/22, at 31. While Officer Pettinato had attempted to put Kitcey's vehicle back in park, Kitcey nevertheless managed to "dr[i]ve off at a

---

[5] 42 Pa.C.S.A. §§ 8951-8955.

[6] The following facts leading up to, and subsequent to, Kitcey's arrest are culled from the trial testimony.

high rate of speed." *Id*. at 31-32. Officers Pettinato and Henneberry pursued Kitcey. *See id*. at 33. The officers followed Kitcey onto Pieper Road until he eventually stopped his vehicle, exited, and ran into some nearby woods. *See id*. at 35, 53. Officers Pettinato and Henneberry found Kitcey, who then started to walk toward them. Officer Pettinato described what happened next:

> [As Kitcey approached, he] had his hand in his jacket as if he was attempting to display he had a weapon inside of his jacket. After I told him multiple times . . . to show me his hand, he eventually took his hand out of his coat[,] and he was taken into custody by Patrolman Henneberry.

*Id*. The officers searched Kitcey and discovered bullets and a methamphetamine pipe. *See id*. at 36-37. The bullets were .38 caliber. *See id*. at 38.

Private citizen Michael Peplinski ("Peplinski"), who lived on Pieper Road in Girard, was on a walk with his wife that evening and saw a green bag in a ditch next to the side of the road. *See id*. at 70, 73. While Peplinski took regular walks with his wife "pretty regularly in the evening[s]," he did not see the bag the night before. *See id*. at 71. Peplinski did not touch the bag, but instead left it by the side of the road. *See id*. at 70. Another citizen, Cathy Markham ("Markham"), was taking her granddaughter to work the next day, and she noticed the green bag on the side of the road, which she retrieved on her way back home, at around noon. *See id*. at 75. Markham brought the bag home, but left it in her car, and did not open it until after three or four hours. *See id*. Markham, upon opening the bag, found "porno tapes and a

- 5 -

gun." *Id*. at 78. The gun was loaded. *See id*. Markham then put the bag back in her car and drove it to the police station. *See id*. at 79. The gun was later determined to be a .38 caliber. *See id*. at 81.[7]

Markham led PSP Trooper Scott McClane to the location where she found the bag, which was near the intersection of Route 20 and Pieper Road, which is in the vicinity of the traffic stop. *See* N.T., 2/17/22, at 20-22. Trooper McClane, aware that there had been a chase the previous day, contacted Lake City Police Department, and learned that Kitcey had been involved. *See id*. at 22. Knowing Kitcey's identity, Trooper McClane obtained "jail calls" between Kitcey and his girlfriend, Christina Balliet ("Balliet"). *See id*. at 23. In these calls, which occurred the day police apprehended Kitcey, Kitcey directed Balliet to "go for a ride," and told her to begin at Elk Park Road, travel east towards Girard, make the first right, which would be on to Pieper Road, and then look to the right. *See id*. at 25. The location Kitcey specified was the site of the bag. *See id*.[8]

Trooper McLane testified that during his search of the green bag, he discovered a black bag containing clear prescription containers that can be

---

[7] Pennsylvania State Police ("PSP") Corporal Dale Wimer, an expert in firearm and toolmark examination, tested the firearm and found that it was operable and capable of discharging the ammunition for which it was manufactured, and that the ammunition found on Kitcey was functional with that firearm. *See* N.T., 2/17/22, at 46-53.

[8] Trooper McClane, upon further investigation, also learned that Kitcey did not have a license to carry a firearm. *See* N.T., 2/17/22, at 27.

used to store or sell narcotics. *See id*. at 8-9. Trooper McLane also discovered three small bags containing a total of 17.43 grams of methamphetamine. *See id*. at 10-11. The black bag also contained a scale as well as other baggies containing methamphetamine, and a glass smoking pipe. *See id*. at 12-13. The bullets recovered from the bag matched those recovered from Kitcey's person. *See id*. at 14.

PSP Corporal Scott Zinram, supervisor for a vice and narcotics unit in Erie, with twenty-two years of experience, and recognized by the trial court as an expert in narcotics investigations and delivery, opined that the amount of meth in the bag evinces an intent by the possessor to deliver the methamphetamine. *See id*. at 38. Corporal Zinram opined, based on his training and experience, that "usually an addict or someone who possesses meth only possesses . . . a half gram or a gram to . . . 3.5 grams. Somebody who has about a half ounce is probably going to be selling that on the streets." *Id*. at 41. Also significant were the scale and baggies inside the bag, which is "PWID paraphernalia that [is] indicative of someone who is going to sell that." *Id*. The close proximity between the paraphernalia and narcotics further shows that the paraphernalia is linked to the drugs. *See id*. at 43. Corporal Zinram additionally estimated that the seventeen grams of methamphetamine in the bag could be sold for $100 a gram, thus, the meth left in the bag would have a street value of $1,700. *Id*. at 42.

Trooper McLane opted against fingerprinting the gun based on advice he received to the effect that a fingerprint analysis could interfere with a subsequent DNA test; however, he submitted a plastic bottle and the pornographic DVDs for fingerprint analysis. *See id*. at 15. The lab found no prints on the bottle and what prints they did find on the DVDs were not Kitcey's. *See id*. at 19. Trooper McClane sent the firearm out for DNA testing in 2018, and, later, the lab contacted the trooper and requested further evidence, namely, a buccal swab from Kitcey. *See id*. at 33. Trooper McClane obtained a search warrant and thereafter a buccal swab in August 2021. *See id*. at 31-34.

Forensic DNA scientist Sabine Panzner-Kaelin tested the DNA. As Ms. Panzner-Kaelin explained, there are two different analyses she can perform, one is the STR test which includes "all of the DNA in all of the chromosomes that will be for females and males," and a second test, the "YSTR" test, which is of DNA "just located on the Y chromosomes." *Id*. at 76-77.[9] Ms. Panzner-Kaelin tested DNA from both the gun and the ammunition. *Id*. at 77. For the ammunition, there was not enough DNA, so Ms. Panzner-Kaelin was unable to

---

[9] Ms. Panzner-Kaelin explained that, for the YSTR test, "because everyone will inherit the Y chromosome from the father, it would not be as unique as it would be with regular STR's. Because [with] regular STR's[,] you get one set from your mother and one from your father. In this case, you only get it [*i.e.*, the Y chromosomes] from your father." N.T., 2/17/22, at 81. Since one's "father only has one Y chromosome[,] . . . everybody . . . in the paternal line will have the same Y chromosome. So it would be the same Y profile." *Id*.

get an "interpretable profile," and was therefore unable to conduct any further testing. *Id*. at 78. For the gun, there was a mixture of DNA, *i.e.*, DNA from more than one person, which "complicated the interpretation." *Id*. Ms. Panzner-Kaelin was likewise unable to get an interpretable DNA profile from the gun using the STR test, but the YSTR test showed a "major profile" that matched Kitcey's DNA with a likelihood of 1 in every 9,742. *See id*. at 78, 80-82, 83.

Following presentation of the *supra* evidence, the jury convicted Kitcey of person not to possess a firearm (count one), PWID (count two), tampering with evidence (count three), carrying a firearm without a license (count four), simple possession of a controlled substance (count five), possession of drug paraphernalia (count six), recklessly endangering another person (count seven), resisting arrest (count eight), and fleeing and eluding (count nine). *See id*. at 130-36.[10]

At the sentencing hearing, at which the trial court considered, among other things, a pre-sentence investigation report, the court sentenced Kitcey as follows: 60-120 months of imprisonment (count one); 21-54 months of concurrent incarceration (count two); two years of consecutive probation (count three); 42-84 months of concurrent imprisonment (count four); no

---

[10] *See* 18 Pa.C.S.A. § 6105(a)(1); 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. §§ 5105(a)(3), 6106(a)(1); 35 P.S. §§ 780-113(a)(16), (a)(32); 18 Pa.C.S.A. §§ 2705, 5104; 75 Pa.C.S.A. § 3733(a).

further penalty (count five); 6-12 months of concurrent incarceration (count six); 6-12 months of consecutive imprisonment (count seven); 1-12 months of concurrent incarceration (count eight); 1-9 months of concurrent incarceration (count nine), plus lab fees, in addition to various fines and charges arising from related summary convictions. *See* N.T., 5/13/22, at 15-18. The aggregate sentence was thus five-and-a-half to eleven years of incarceration with two years of consecutive probation.

Kitcey filed a post-sentence motion on May 20, 2022, in which he solely argued that the traffic stop was performed without probable cause and outside of the officer's jurisdiction. *See* Post-Sentence Motion, 5/20/22, at ¶ 4. The trial court denied this motion on May 23, 2022. *See* Order, 5/23/22. The next day, present counsel, Abigail B. Cohen, entered her appearance and filed a second post-sentence motion. *See* Entry of Appearance, 5/24/22; Post-Sentence Motion, 5/24/22. The post-sentence motion, while dated May 23, 2022, was not filed until May 24, 2022, and thus was untimely. *See* Pa.R.Crim.P. 720(A)(1). The trial court nevertheless ruled on the motion and denied it on May 25, 2022. *See* Order, 5/25/22.[11] On June 24, 2022, Kitcey

_____

[11] Kitcey filed another untimely post-sentence motion, dated May 26, 2022, but time-stamped June 1, 2022. There appears to be no order denying this motion.

appealed.[12]  Following several extensions of time, Kitcey filed a court-ordered concise statement of matters complained of on appeal on October 3, 2022, and the trial court likewise complied with Pa.R.A.P. 1925.

Kitcey raises the following issues for our review:

1. Did . . . Officer [] Pettinato violate the [MPJA] because [] Kitcey's stop occurred outside the officer's primary jurisdiction, and the officer was neither in fresh pursuit nor on official business?

2. Was the evidence insufficient to prove that [] Kitcey possessed the backpack or any contraband where the backpack could have been on the side of the road for days, and the evidence linking it to [] Kitcey was specious?

3. Were the verdicts against the weight of the evidence because the evidence linking [] Kitcey to the contraband was far outweighed by the commonsense conclusion that the backpack had been on the side of the road for several days?

Kitcey's Brief at 5.

_____

[12] Kitcey's appeal is facially untimely because the trial court denied his post-sentence motion on May 23, 2022, and the thirty-day appeal period expired on June 22, 2022.  **See** Pa.R.A.P. 903(a).  However, the trial court, when it denied Kitcey's timely first post-sentence motion, did not include Kitcey's appellate rights; and it did not inform Kitcey that his untimely second post-sentence motion did not toll the thirty-day appeal period. **Cf.** Pa.R.Crim.P. 720(B)(4)(a) (providing that "[a]n order denying a post-sentence motion. . . shall include notice to the defendant of the . . . right to appeal and the time limits within which the appeal must be filed. . . .").  This Court has found that such circumstances constitute a breakdown in court operations and thus provide grounds to excuse an otherwise untimely appeal.  **See Commonwealth v. Juray**, 275 A.3d 1037, 1040 n.1 (Pa. Super. 2022) (citing **Commonwealth v. Patterson,** 940 A.2d 493, 498-99 (Pa. Super. 2007)). For these reasons, we consider Kitcey's appeal timely.

In his first issue, Kitcey argues that the trial court erred in denying suppression because Officer Pettinato initiated a traffic stop outside of his jurisdiction and no exceptions applied under the MPJA.[13]

Our standard of review for an order denying suppression is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal

---

[13] Pennsylvania Rule of Criminal Procedure 581(D) provides that a suppression motion "shall state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof." Pa.R.Crim.P. 581(D). This Court has found waiver of suppression arguments where "[t]he instant motion clearly does not state with specificity and particularity the grounds for suppression or describe the facts and events underlying the grounds for suppression." **Commonwealth v. Menginie**, 458 A.2d 966, 970 (Pa. Super. 1983); **see also Commonwealth v. Dixon**, 997 A.2d 368, 376 (Pa. Super. 2010) (providing that the Commonwealth need not present testimony addressing anything beyond the specific grounds asserted in the suppression motion). Here, Kitcey has arguably waived his MPJA argument, as his suppression motion did not assert his MPJA argument. **See** Omnibus Motion for Pre-Trial Relief, 9/7/21, at ¶¶ 1-4, 11-12; **accord** Commonwealth's Response to Defendant's Omnibus Pre-Trial Motion, 12/13/21, at p.4 (noting that "[Kitcey] also argued during the suppression hearing, **for the first time**, Patrolman Pettinato was outside of his jurisdiction, when he stopped [Kitcey's] vehicle, citing the [MJPA]") (emphasis added). Accordingly, we could find this issue waived. However, the Commonwealth did not assert waiver or object; and the trial court considered the merits of the argument as orally presented at the suppression hearing. For these reasons, we decline to find waiver.

- 12 -

conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Mbewe*, 203 A.3d 983, 986 (Pa. Super. 2019) (internal citations and quotations omitted).

Regarding the MPJA, this Court has explained:

> The MPJA defines the primary territorial jurisdiction of municipal police officers as "[t]he geographical area within the territorial limits of a municipality or any lawful combination of municipalities which employs a municipal police officer." 42 Pa.C.S.A. § 8951. "The MPJA is intended to promote public safety while maintaining police accountability to local authority; it is not intended to erect impenetrable jurisdictional walls benefiting only criminals hidden in their shadows." *Commonwealth v. Lehman*, [] 870 A.2d 818, 820 ([Pa.] 2005) (emphasis, brackets, internal quotation marks and citations omitted). To that end, "[s]ection 8953 [of the MPJA] authorizes arrests, execution of search warrants and other official police conduct outside of an officer's primary jurisdiction in six specific circumstances." *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023, 1029 ([Pa.] 1989).

*Commonwealth v. Hobel*, 275 A.3d 1049, 1057 (Pa. Super. 2022), *appeal denied*, 286 A.3d 710 (Pa. 2022). The specific circumstance, relevant herein, is as follows:

> (2)    Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

42 Pa.C.S.A. § 8953(a)(2).

"While [s]ection 8953(a)(2) requires both 'hot pursuit' and 'fresh pursuit' to fulfill the exception to the MPJA, the statute does not include definitions for either form of pursuit." *Commonwealth v. Peters*, 965 A.2d 222, 225 (Pa. 2009). This Court has "clarified that 'hot pursuit' entails some sort of chase, though the chase need not involve a 'fender smashing Hollywood style chase scene' or be newsworthy." *Commonwealth v. Laird*, 797 A.2d 995, 998 (Pa. Super. 2002) (citing *Commonwealth v. McPeak*, 708 A.2d 1263 (Pa. Super. 1998)). "'[F]resh pursuit' requires that it be immediate, continuous and uninterrupted." *Peters*, 965 A.2d at 224 (internal citation omitted).

Even when a police officer's extraterritorial actions do not fall within one of the MPJA's exceptions, suppression is not automatic. *See Hobel*, 275 A.3d at 1058 (citing *O'Shea*, 567 A.2d at 1029). This Court has provided that, where there is a violation of the MPJA, we must apply the three-prong *O'Shea* test on a case-by-case basis:

> The factors to be considered in applying this case-by-case approach consist of all the circumstances of the case including [1] the intrusiveness of the police conduct, [2] the extent of deviation from the letter and spirit of the [MPJA], and [3] the prejudice to the accused. . . . The . . . spirit, or purpose of, the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist.

*Hobel*, 275 A.3d at 1058 (quoting *Commonwealth v. Henry*, 943 A.2d 967, 971-72 (Pa. Super. 2008)) (internal citations omitted).[14]  Regarding prejudice to the accused, the inquiry is "whether the search would not have otherwise occurred or would not have been as intrusive" absent the violation.  *Hlubin*, 208 A.3d at 1048 (quoting *O'Shea*, 567 A.2d at 1030).

Kitcey argues section 8953(a)(2) of the MPJA does not apply because Officer Pettinato was not in "hot pursuit," as he did not engage in "immediate, continuous, and uninterrupted chase of the suspect."  Kitcey's Brief at 13. Kitcey maintains that the up-to-sixty seconds it took Officer Pettinato to confirm that Kitcey's registration was suspended prior to pursing him militates against a finding of hot- and fresh-pursuit.  *See id*.

The trial court considered this argument and concluded it merits no relief:

> Here, Officer Pettinato viewed an offense (expired registration) that occurred in his jurisdiction.  He pursued the vehicle within one minute and stopped the vehicle 2.6 miles away in the neighboring jurisdiction.  Thus, the Court finds that the stop was permitted by § 8953(a)(2).

Trial Court Opinion, 12/29/21, at 2.

---

[14] In *Hobel*, this Court noted that several of our Supreme Court justices indicated their opposition in *Commonwealth v. Hlubin*, 208 A.3d 1032 (Pa. 2019) (plurality) to the continued application of *O'Shea*; however, three declined to address the validity of *O'Shea*; and one supported its application. *See Hobel*, 275 A.3d at 1058 n.5.  Accordingly, *O'Shea* "remains good law." *Id*.

- 15 -

Following our review, we conclude the trial court's legal conclusions were not erroneous. ***Laird*** is instructive. There, this Court concluded:

There is no dispute that, while still in [their jurisdiction in] Newport [Borough], the officers obtained probable cause to stop [Laird] for driving a vehicle with a broken taillight. . . . When coupled with the officers' immediate hot pursuit within Newport, the acquisition of such probable cause enabled the officers to execute an extraterritorial stop under the MPJA.

***Laird***, 797 A.2d at 999–1000. Similarly here, the evidence from the suppression hearing reveals the following: Officer Pettinato obtained probable cause to stop Kitcey while he was in his jurisdiction. The officer observed Kitcey operating the vehicle in his jurisdiction, and the officer received information confirming the expired registration of Kitcey's vehicle between thirty and sixty seconds. ***See Commonwealth v. Calabrese***, 184 A.3d 164, 167 (Pa. Super. 2018) (stating that "Pennsylvania law makes clear that a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense") (internal citations and quotations omitted). Immediately upon receipt of confirmation of the expired registration, Officer Pettinato initiated a pursuit which ended in an adjacent jurisdiction. We decline to disturb the trial court's finding that these facts constitute both "hot" and "fresh" pursuit. ***See Laird***, 797 A.2d at 999-1000.[15]

_____

[15] Kitcey cites ***Martin v. Com., Dep't of Trans., Bureau of Driver Licensing***, 905 A.2d 438, 446 (Pa. 2006) in support of his claim that Officer Pettinato was not authorized by section 8593(a)(2) to stop him because the officer was not in hot pursuit. ***See*** Kitcey's Brief at 16-17. In ***Martin***, the
*(Footnote Continued Next Page)*

While, for the above reasons, we do not find an MPJA violation, we conclude that even if there were an MPJA violation, suppression would not be appropriate. As stated above, in determining whether suppression is an appropriate remedy following an MPJA violation, we must also consider the *O'Shea* factors: (1) the intrusiveness of the police conduct; (2) the extent of deviation from the letter and spirit of the MPJA; and (3) the prejudice to the accused. *See O'Shea*, 567 A.2d at 1030; *see also Hobel*, 275 A.3d at 1058 (applying *O'Shea*).

Regarding the first *O'Shea* prong, namely, the intrusiveness of the extraterritorial action: here, the stop cannot be considered impermissibly intrusive because Officer Pettinato merely initiated the stop and ran Kitcey's information; no further investigation occurred prior to arrival of Girard Borough Officer Henneberry, since Kitcey fled upon learning there were warrants for his arrest. *Cf. Hlubin*, 208 A.3d at 1048 (Justices Donohue, Todd, and Wecht concluding, as part of an opinion in support of the judgment of the Court, that an extraterritorial stop resulted in a high level of intrusiveness where the officer, based on "initial questions and observations, . . . removed Hlubin from her vehicle and took her to a testing area, where she was subjected to field sobriety testing, blood testing and arrest"). The second *O'Shea* factor likewise militates against suppression. This Court has

_____

bureau conceded subsection (a)(2) did not apply and did not argue it before our Supreme Court; therefore, *Martin* is distinguishable. 905 A.2d at 446.

stated that "the spirit of the MPJA, or purpose of, the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist." *Hobel*, 275 A.3d at 1058. Here, Officer Pettinato obtained probable cause in his jurisdiction, and pursued Kitcey based on that evidence; and he therefore did not travel outside of his jurisdiction to acquire additional evidence. The final *O'Shea* factor, the prejudice factor, also favors the Commonwealth. According to Officer Pettinato's testimony, he called for backup and informed dispatch he was making the stop as he turned on his lights to perform the traffic stop. *See* N.T., 11/30/21, at 25. Officer Pettinato estimated that the time between when he witnessed the violation and when he conducted the traffic stop was about two minutes. *See id*. at 26. Shortly after Officer Pettinato conducted the stop, a Girard Police Department officer responded. *See id*. at 12. Once Kitcey fled, they pursued him together. *See id*. at 12, 32. The evidence supports a finding that, because Officer Pettinato reported the stop to dispatch just as he turned on his lights, and, shortly after, during the pendency of the stop, a Girard Borough police officer responded, Kitcey would have been stopped by a Girard Borough police officer, and thereafter apprehended in Girard, even if Officer Pettinato had not conducted the stop. *See Hlubin*, 208 A.3d at 1048 (providing that the "prejudice" inquiry is "whether the search would not have

otherwise occurred or would not have been as intrusive" absent the violation).

Therefore, Kitcey is due no relief.[16]

In his second issue, Kitcey challenges the sufficiency of the evidence, namely, his possession of the backpack and its contents. Our standard of review in a sufficiency of the evidence case is:

> to determine if the Commonwealth established beyond a reasonable doubt each of the elements of the offense, considering all the evidence admitted at trial, and drawing all reasonable inferences therefrom in favor of the Commonwealth as the verdict-winner. The trier of fact bears the responsibility of assessing the credibility of the witnesses and weighing the evidence presented. In doing so, the trier of fact is free to believe all, part, or none of the evidence.

***Commonwealth v. Hopkins***, 67 A.3d 817, 820 (Pa. Super. 2013) (internal citation and indentation omitted).

Kitcey asserts that the evidence was insufficient to support his convictions because the Commonwealth failed to establish beyond a reasonable doubt that he possessed the backpack containing the drugs, paraphernalia, and gun. This Court has set forth the law regarding possession as follows:

> The Commonwealth may meet its burden of proving a possessory crime by showing actual possession, constructive possession, or joint constructive possession. "Constructive possession" is the ability to exercise a conscious dominion over the contraband. It usually comes into play when police find contraband somewhere other than on the defendant's person. Constructive possession

---

[16] Based on our resolution, we do not reach the parties' additional arguments concerning other possible sources of authority for Officer Pettinato's extraterritorial stop of Kitcey's vehicle.

- 19 -

requires proof that the defendant had knowledge of the existence and location of the item. The Commonwealth may prove such knowledge circumstantially. That is, it may prove that the defendant had knowledge of the existence and location of the items at issue from examination of the totality of the circumstances surrounding the case . . ..

***Commonwealth v. Hall***, 199 A.3d 954, 960–61 (Pa. Super. 2018) (internal citations and some quotations omitted).

Kitcey argues that that he did not "actually possess a firearm when the police arrested him," and, therefore, the Commonwealth's theory of the case rested on constructive possession. ***See*** Kitcey's Brief at 18-19. Kitcey argues that neither officer saw him with the backpack containing the contraband. ***See id***. at 19. He also argues that the backpack was found the next day, it was not established how long the backpack had been there, and the DNA evidence was consistent with anyone in Kitcey's "paternal lineage." ***See id***. at 19.

The trial court considered this claim and concluded it lacked merit:

> The Commonwealth presented testimony which was sufficient to support the element of possession in the above charges. Evidence was presented that [Kitcey] threw the green backpack, which contained drugs, paraphernalia, and a firearm, out of the passenger window of his car while fleeing the police. During the trial, evidence was presented that the firearm recovered from the green backpack had [Kitcey's] DNA on it. [Kitcey] also instructed his girlfriend, on a recorded prison call, where to find the green backpack on the side of the road. Thus, the Commonwealth presented sufficient evidence to enable the jury to find that [Kitcey] had possessed the green backpack containing drugs, paraphernalia, and the firearm.

Trial Court Opinion, 10/12/22, at 2-3.

Following our review, we conclude that the evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to prove beyond a reasonable doubt that Kitcey possessed the bag and contraband. We note: the bag was found in the area where Kitcey fled from police into the woods; Kitcey, following his apprehension, told his girlfriend in a recorded jailhouse call to "take a ride," and gave her directions to the location of the bag; ammunition in the bag, which was the right caliber for the firearm in the bag, matched the ammunition recovered from Kitcey's person; and Kitcey's paternal DNA was on the gun. This totality of this evidence, taken together, shows Kitcey's knowledge of the contraband as well as its location, and demonstrates his conscious dominion over it. *See Hall*, 199 A.3d at 960–61. Thus, this issue warrants no relief.

In his third and final issue, Kitcey argues the verdict was against the weight of the evidence. Before addressing the merits of this issue, we must first determine whether Kitcey has preserved it for our review. A weight claim may be "deemed waived because of [a] failure to raise the issue in a timely post-sentence motion." *Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa. Super. 2004). Further, there is no authority for a trial court to entertain an untimely post-sentence motion. *See id*. at 733. Instead, a defendant must file a post-sentence motion *nunc pro tunc*. If the "right to file a post-sentence motion was not restored *nunc pro tunc,* the trial court should not . . .

entertain[] [a] post-sentence motion which was clearly untimely." *Id*. at 734.

Further,

> [t]o be entitled to file a post-sentence motion *nunc pro tunc,* a defendant must, within 30 days after the imposition of sentence, demonstrate sufficient cause, *i.e.*, reasons that excuse the late filing.... When the defendant has met this burden and has shown sufficient cause, the trial court must then exercise its discretion in deciding whether to permit the defendant to file the post-sentence motion *nunc pro tunc.*  **If the trial court chooses to permit a defendant to file a post-sentence motion nunc pro tunc, the court must do so expressly.**

*Id*. (internal citation and indentation omitted; emphasis added).  Lastly, "[t]he request for *nunc pro tunc* relief is separate and distinct from the merits of the underlying post-sentence motion.  **The trial court's resolution of the merits of the late post-sentence motion is no substitute for an order expressly granting nunc pro tunc relief**."  *Id*. (internal citation and indentation omitted; emphasis added).

Here, Kitcey did not raise a weight claim in his timely-filed first post-sentence motion.  Instead, he raised it in his counseled, but untimely, second post-sentence motion, filed eleven days after his judgment of sentence.  *Cf*. Pa.R.Crim.P. 720(A)(1) (requiring post-sentence motions to be filed "no later than 10 days after imposition of sentence"); Pa.R.Crim.P. 114(A)(1) (providing that "[a]ll orders and court notices promptly shall be transmitted to the clerk of courts' office for filing.  Upon receipt in the clerk of courts' office, the order or court notice promptly shall be time stamped with the date of receipt"); Pa.R.Crim.P. 114 cmt. (stating that, "**[t]he date of receipt is**

***the date of filing under these rules***") (emphasis added). As Kitcey did not raise his weight claim in a timely post-sentence motion, and he did not receive permission to file a post-sentence motion *nunc pro tunc*, his weight claim is waived, and we decline to review it. ***See Wright***, 846 A.2d at 736.

Judgement of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/8/2023